Josephine H. Mooney, OSB #882738
Senior Vice President, Chief Legal & Risk Officer
ST. CHARLES HEALTH SYSTEM, INC.
2500 NE Neff Road
Bend, OR 97701
(541) 706-4494 / jhmooney@stcharleshealthcare.org
Attorneys for Plaintiff (*Local Counsel*)

Ryan A. McDonald, IN Attorney Reg. #36118-30
HALL, RENDER, KILLIAN, HEATH & LYMAN, P.C.
500 North Meridian Street, Ste. 400
Indianapolis, IN 46204
(317) 633-4884 / rmcdonald@hallrender.com
Attorneys for Plaintiff (*Pro Hac Vice*)

Lindsay K. McManus, CO Attorney Reg. #56572
HALL, RENDER, KILLIAN, HEATH & LYMAN, P.C.
999 17th Street, Ste. 800
Denver, CO 80202
(720) 813-6898 / lmcmanus@hallrender.com
Attorneys for Plaintiff (*Pro Hac Vice*)

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| ST. CHARLES HEALTH SYSTEM, INC. Provider No. 38-0047 2500 Northeast Neff Road Bend, OR 97701 <br><br> Plaintiff, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, <br><br> Defendant. | Case No.: X:XX-cv-XXXX-XX <br><br><br> **COMPLAINT FOR JUDICIAL REVIEW** |

Complaint for Judicial Review                    1

## COMPLAINT FOR JUDICIAL REVIEW

St. Charles Health System, Inc. brings this action under 42 U.S.C. § 1395oo(f)(1), for judicial review of a final decision of the Defendant, Robert F. Kennedy, Jr., acting in his official capacity as the Secretary of the United States Department of Health and Human Services through HHS's Provider Reimbursement Review Board (Board), and states as follows:

## STATEMENT OF THE CASE

1. Until February 15, 2022, St. Charles Health System, Inc., a single corporate Oregon legal entity (Plaintiff), owned and operated four providers, at four locations in Central Oregon, with four CMS Certification Numbers (CCNs). Those providers, each an unincorporated division of Plaintiff, were (1) St. Charles Bend (Medicare CCN 38-0047) in Bend, Oregon (Bend); (2) St. Charles Redmond (CCN 38-0040) in Redmond, Oregon (Redmond); (3) St. Charles Madras (CCN 38-1324), a critical access hospital (CAH) in Madras, Oregon (Madras); and (4) St. Charles Prineville (CCN 38-1313), a CAH in Prineville, Oregon (Prineville). This Complaint concerns the combination of two of those providers—Bend and Redmond—which took effect on February 15, 2022.

2. That is, effective 12:01 a.m. on February 15, Redmond retired its CCN and became a remote location of Bend's main campus. Simultaneously, Plaintiff submitted an application for Bend to be classified as a sole community hospital and reclassified as rural. Bend's applications should have been straightforward: Bend and Redmond (i.e., its remote location in Redmond, OR) are over 110 road miles from the next closest "like" hospital—McKenzie-Willamette Medical Center in Springfield, OR. But the Secretary, via CMS and the Board, denied Bend's applications on the basis of requirements that were not imposed by Congress or promulgated via the notice-and-comment publication process.

Complaint for Judicial Review                    2

3.  Because of its location and patient population, rural reclassification and sole community hospital status mattered to Bend in ways that Congress has recognized for decades. In fact, even before transitioning to the Prospective Payment System in 1983 (now the IPPS), Congress recognized the special needs of hospitals in remote areas which serve a patient population which spans such a wide geographic area.

4.  When Congress implemented caps on hospital reimbursement for providing treatment to inpatient Medicare beneficiaries in TEFRA, Congress commanded the Secretary to provide for exemptions, exceptions, and adjustments to those caps

> [T]o take into account the special needs of sole community hospitals … and to take into account extraordinary circumstances beyond the hospital's control, medical and paramedical education costs, significantly fluctuating population in the service area of the hospital, and unusual labor costs.

42 U.S.C. § 1395ww(a)(2), PL 97-248, Sept. 3, 1982, 96 Stat 324.

5.  But Congress didn't stop there. When it implemented IPPS the following year, it precluded the Secretary from applying the downward-ratcheting percentage caps to sole community hospitals. 42 U.S.C. § 1395ww(d)(5)(C)(ii), PL 98-21, Apr. 20, 1983, 97 Stat 65. Congress also ordered the Secretary to increase the compensation paid to sole community hospitals that have seen a substantial reduction in their "total number of inpatient cases" to fully compensate them for their "fixed costs … in providing inpatient hospital services, including the reasonable cost of maintaining necessary core staff and services." 42 U.S.C. § 1395ww(d)(5)(C)(ii), PL 98-21, Apr. 20, 1983, 97 Stat 65.[1]

---

[1] Congress also defined "sole community hospital" for the first time as:
> A hospital that, by reason of factors such as isolated location, weather conditions, travel conditions, or absence of other hospitals (as determined by the Secretary), is the sole source of inpatient hospital services reasonably available to individuals in a geographic area who are entitled to benefits under part A [of Medicare].

*Id*.

Complaint for Judicial Review                    3

6.  Congress knew that these special provisions, however, didn't go far enough in reimbursing sole community hospitals sufficiently to keep them open and available to treat patients in these remote regions. Congress therefore also commanded:

> The Secretary shall complete a study and make legislative recommendations to the Congress with respect to an equitable method of reimbursing sole community hospitals which takes into account their unique vulnerability to substantial variations in occupancy.

PL 98-21, Apr. 20, 1983, 97 Stat 65, Section 603, 42 U.S.C. § 1395ww note (a)(3)(A).

7.  Congress recognized the particular challenge confronting a sole community hospital: it must remain staffed for everything—even though its inpatient population doesn't generate enough revenue to support that high level of staffing. In other words, where IPPS splits the average allowable operating cost of all hospitals across all discharges and then adjusts reimbursement for the acuity or condition (via the DRG factor applied in 42 U.S.C. § 1395ww(d)(2)(G) and (d)(3)(G)) of the individual inpatients the hospital treated, sole community hospitals don't have enough inpatients to support their level of staffing.

8.  Either CMS reimburses them differently—or they face the same fate as the more than one hundred rural hospitals that have closed over the past decade. Ctr. for Healthcare Quality & Payment Reform, *Rural Hospitals at Risk of Closing* (May 2026), https://chqpr.org/downloads/Rural_Hospitals_at_Risk_of_Closing.pdf (further reporting that more than 700 rural hospitals are at risk of closing and almost 300 are at immediate risk of closing).

9.  Come early 2022, and Plaintiff owned and operated four hospitals: Madras (CCN 38-1324) – a critical access hospital; Prineville (CCN 38-1313) – a critical access hospital; Redmond (CCN 38-0040), and Bend (CCN 38-0047).

10.    Through these four facilities, Plaintiff cared for the residents of Central Oregon, who are secluded between the Cascades and Ochoco Mountains. Much of the year, the patient population of Deschutes, Jefferson, and Crook Counties is approximately 215,000 residents. However, that region hosts millions of seasonal tourists each year—swelling the potential patient population.



11.    Bend, however, was about 18 road miles from Redmond—preventing Bend from qualifying as an SCH and foreclosing it from receiving the reimbursement it needed to remain successful and serve its fluctuating patient population.[2]

---

[2] CMS, via the Secretary, has explicitly confirmed that critical access hospitals are not "like" acute care hospitals, cannot be SCHs, and do not impact the SCH analysis. CAHs are essentially emergency departments that can admit a patient for brief periods as necessary. They can have no more than 25 inpatient, non-emergency beds; must maintain an average length of stay less than four days; and can staff their emergency departments with just nurses so long as a licensed provider like a physician, PA, or NP is on-call according to particular timing requirements. CMS and the

Complaint for Judicial Review                    5

12.    But Bend had a direct pathway to qualify for SCH status under federal law. Effective February 15, 2022, Plaintiff retired Redmond's CCN (38-0040) and combined Redmond's provider agreement into Bend. Redmond became the "Redmond Campus" of CCN 38-0047; the Bend location kept its footprint and became the "Main Campus" of CCN 38-0047.

13.    Since each of these facilities were already unincorporated divisions of the same single legal entity (St. Charles Health System, Inc.), this combination could occur without any CMS review or approval. This was not a change in ownership, just a combination of two providers into one—which requires filing only an administrative notice to inform CMS.

14.    This was no scheme or trick. In fact, the Secretary had published, through notice-and-comment rulemaking, specific guidance for multicampus hospitals because:

> [T]he regulations at § 412.92 for sole community hospitals (SCHs), § 412.96 for rural referral centers (RRCs), § 412.103 for rural reclassification, and § 412.108 for Medicare-dependent, small rural hospitals (MDHs) do not directly address multicampus hospitals. Thus, in the FY 2019 proposed rule, we proposed to codify in these regulations the policies for multicampus hospitals that we have developed in response to recent questions regarding CMS' treatment of multicampus hospitals.

83 Fed. Reg. 41,144, 41,369 (Aug. 17, 2018).

15.    The Secretary proposed and finalized the addition of 42 C.F.R. § 412.92(a)(4), requiring:

> For a hospital with a main campus and one or more remote locations under a single provider agreement where services are provided and billed under the inpatient hospital prospective payment system and that meets the provider-based criteria at § 413.65 of this chapter as a main campus and a remote location of a hospital, combined data from the main campus and its remote location(s) are required to demonstrate [that both "the main campus

_____

Secretary have acknowledged that CAHs "are not like hospitals to be SCHs. CAHs are generally smaller with a very limited length of stay, while SCHs operate as full-service, acute-care hospitals." 66 Fed. Reg. 39872, 39876 (Aug. 1, 2001). Thus, Prineville and Madras did not factor into the analysis.

Complaint for Judicial Review                6

and its remote location(s) each independently satisfy"] the mileage and rural location criteria in paragraph (a) of this section.

16. After the combination, the nearest "like" hospital to Bend was McKenzie-Willamette Medical Center, CCN 38-0020—more than 100 miles west across the mountains.



17. By the time Plaintiff retired CCN 38-0040 and combined Redmond's provider agreements into CCN 38-0047, Congress had grappled with the challenge of effectively reimbursing sole community hospitals for 39 years and 7 months.

18. Congress had redefined "the term 'sole community hospital' [as] any hospital that the Secretary determines is located more than 35 road miles from another hospital." 42 U.S.C. § 1395ww(d)(5)(D)(iii)(I). Bend's Main Campus is 113 miles from McKenzie-Willamette Medical Center. Likewise, Bend's Redmond Campus is 111 miles from McKenzie-Willamette Medical Center.

19.     Congress did not impose any further prongs, elements, or components of the test under

(d)(5)(D)(iii)(I); Bend is a sole community hospital. Therefore, it "shall be" paid either:

> [A]n amount based on 100 percent of the hospital's target amount for the cost reporting period, as defined in subsection (b)(3)(C), or the amount determined under paragraph (1)(A)(iii), whichever results in greater payment to the hospital.

42 U.S.C. § 1395ww(d)(5)(D)(i).

20.     Likewise, Congress has commanded that:

> [N]ot later than 60 days after receipt of an application (in a form and manner determined by the Secretary) from a subsection (d) hospital … the Secretary shall treat the hospital as being located in the rural area … of the State in which the hospital is located [if] [t]he hospital would qualify … as a sole community hospital under paragraph (5)(D) if the hospital were located in a rural area."

42 U.S.C. § 1395ww(d)(8)(E). Again, Congress imposed no additional prongs, elements,

or components of this test—so long as Plaintiff sent in Bend's application, Bend qualified

for rural reclassification when it became an SCH.[3]

21.     Plaintiff submitted Bend's Application for Sole Community Hospital Status and Rural

Reclassification on February 15, 2022—hours after its retirement of CCN 38-0040 and

combination of two providers into one qualified it – according to Congress – for both.

22.     Having received and reviewed that Application, the relevant Medicare Administrative

Contractor (MAC) recommended CMS approve it and grant Bend SCH status – and

therefore rural reclassification – effective retroactively to the combination date of

February 15, 2022. In so doing, the MAC affirmed Bend's Application was complete.

---

[3] Congress has determined that rural, sole community hospitals require additional reimbursement distinct from that provided for under IPPS and commanded the Secretary to pay them, *inter alia*, an increased disproportionate share adjustment percentage. 42 U.S.C. § 1395ww(d)(5)(F)(iv)(VI).

23.     Instead, CMS refused and denied Bend's Application. Specifically, in its April 15, 2022 denial letter, CMS wrote:

> The MAC conducted its own review to verify the provider's listing that no like hospitals were located under 35 miles of SCMCB. The only current like facility is Redmond which is 17.8 miles away. The provider stated that effective February 15, 2022, Redmond merged with SCMCB and subsequently filed the 855A to effectuate a provider-number acquisition and merger with SCMCB accepting automatic assignment of Redmond's provider agreement. The provider referenced a September 6, 2013 CMS Survey and Certification memo which details the automatic assignment of Medicare agreement under 42 CFR 489.18(c). We confirmed with Acute and Continuing Care Branch staff that if the documents provided with the application reflect what the provider has described, this situation is an automatic assignment of Medicare agreement. On March 17, 2022, Noridian issued a letter stating that it has assessed the provider's change of ownership Medicare enrollment application. However, CMS staff has not received the complete application from the State Agency and will not be able to issue a final determination until all documents are reviewed.
>
> Per 42 CFR 412.92(b)(2), for applications received on or after October 1, 2018, sole community hospital status is effective as of the date the MAC receives the complete application, except as provided in paragraph (b)(2)(v) of this section. Thus, we conclude that St. Charles Medical Center Bend cannot be approved as a sole community hospital under 42 CFR § 412.92(a) until the merger is approved by CMS. The provider should resubmit their application to the MAC which includes documentation that the merger is approved.

24.     CMS got the facts right but got its own governing law wrong. CMS acknowledged that Redmond's retirement of CCN 38-0040 and combination into Bend as a remote location "is an automatic assignment of Medicare agreement;" that is, Bend accepted automatic assignment of Redmond's provider agreement into Bend's provider number. CMS acknowledged that SCH status would therefore be effective "as of the date the MAC receives the complete application" – which happened February 15, 2022. But CMS then decided its "staff has not received the complete application from the State Agency ….

Thus, we conclude that [Bend] cannot be approved as a sole community hospital under 42 C.F.R. § 412.92(a) *until the merger is approved by CMS*."

25.    CMS agreed that no merger occurred because Plaintiff owned both Bend and Redmond, but simultaneously denied Bend's Application because "the merger" hadn't been approved by CMS. No statute, regulation, or sub-regulatory guidance compelled Plaintiff to get CMS's approval of Redmond's combination into Bend or otherwise include that approval in Bend's Application.

26.    CMS also denied Bend's Application because it had "not received the complete application from the State Agency." No statute, regulation, or sub-regulatory guidance compelled Plaintiff to get additional documents, records, or approval from any agency of the State of Oregon.

27.    In this way, CMS imposed an additional hurdle on Plaintiff – approval of the combination or merger – which finds no support in the relevant statutes, regulations, or sub-regulatory guidance. In fact, CMS's guidance actually contradicts this additional *ad hoc* requirement. Further, CMS subsequently recognized – retroactive to February 15, 2022 – the retirement of CCN 38-0040 and Redmond's addition as a remote location under CCN 38-0047.

28.    CMS's denial was arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and without observance of procedure required by law. 5 U.S.C. § 706.

29.    While Plaintiff disputed CMS's denial of Bend's Application due to CMS's fabrication and imposition of additional requirements, Plaintiff couldn't give up on obtaining SCH status and rural reclassification. Plaintiff resubmitted Bend's Application on May 11, 2022.

Complaint for Judicial Review                    10

30. CMS granted the resubmitted Application for SCH status effective May 12, 2022. In its June 2, 2022 SCH status approval letter, CMS claimed it "approved the merger on May 12, 2022." CMS concluded that was "the date on which [the MAC] received notification that the merger was finalized …. Therefore, the SCH effective date for St. Charles Medical Center Bend is May 12, 2022."

31. CMS granted the resubmitted Application for rural reclassification effective May 11, 2022. CMS wrote in its June 2, 2022 approval letter that, as of the date Plaintiff filed Bend's application, Bend qualified as an SCH and therefore met the regulatory requirements for rural hospital status.

32. CMS's denial of the February 15 Application and subsequent approval of the resubmitted Application cost Bend an estimated $4,642,434! Noridian, Bend's MAC, acted in compliance with CMS's determinations and denied Bend that much reimbursement in violation of Congress's statutory commands.

33. What did Plaintiff change from the first application to the second that could justify CMS's reversal?

    a. Plaintiff included the denial letters from CMS and Noridian. These certainly aren't required by federal law for Bend to qualify as an SCH (and, concurrently, a rural hospital).

    b. Plaintiff included a letter from Noridian dated March 17 wherein Noridian acknowledges receiving from Plaintiff a "Change of Ownership Medicare enrollment application" which Noridian forwarded to CMS for review. But as CMS already acknowledged in its April 15 letter, federal law doesn't require Plaintiff to obtain CMS's approval of "an automatic assignment of Medicare agreement."

Complaint for Judicial Review          11

c. Plaintiff included Form CMS-1539 completed by "the state survey agency." The state survey agency remarked, "Redmond is ceasing the use of the CCN previously assigned to Redmond, and St. Charles Bend is adding Redmond as a remote location of St. Charles Bend, Effective date: 02/15/2022." The state survey agency also listed the "Type of Action" as "9. Other" instead of "4. CHOW." But federal law does not condition Bend's SCH reimbursement (and, concomitantly, rural reclassification) on a state agency's completion of Form CMS-1539. On the contrary, Medicare program guidance clarifies that the *MAC* may elect to seek Form CMS-1539 from the State Agency, but that it is not within the responsibility or the authority of the *provider* to do so. CMS Program Memorandum 22-02-ALL, Dec. 23, 2021, Part II, § (III). Oregon Health Authority (OHA), which serves as CMS's contracted agent for survey and licensure matters, has also confirmed via correspondence to Plaintiff that not only was it OHA's responsibility to prepare and submit CMS Form 1539, but that it did so for Bend.

34. CMS fabricated additional requirements that Congress did not contemplate and imposed them as a barrier between Bend and SCH status, and those requirements substantively impacted Bend's reimbursement for services rendered to Medicare beneficiaries. CMS violated Congress's command and short-changed Plaintiff millions.

35. Plaintiff timely appealed CMS's and Noridian's erroneous determination to the Board in Board Case # 23-0056. But on April 8, 2026, the Board rubber-stamped CMS's and Noridian's errors when it denied Plaintiff's appeal and found "CMS properly denied [Bend's] February 15, 2022 applications for SCH status and rural reclassification." *St. Charles Bend*, PRRB Dec. No. 2026-D13, at 3 (Provider Reimbursement Review Board,

April 8, 2026), attached hereto as Exhibit 1. Plaintiff now timely seeks judicial review of this adverse and illegal agency action.

36.    For these reasons, and for those described more fully below, the Provider Reimbursement Review Board's April 8, 2026 decision upholding CMS's denial of Bend's application should be reversed.

37.    By letter dated May 26, 2026, the Administrator of CMS declined to review the Board's adverse decision.

## PARTIES

38.    St. Charles Health System, Inc. is a not-for-profit, duly incorporated legal entity which wholly owned and operated St. Charles Bend (Medicare Provider No. 38-0047) – an acute-care hospital in Bend, Oregon. At all times relevant to this action, it was qualified as a Medicare-participating, general acute-care hospital provider under the Medicare Act.

39.    Defendant Robert F. Kennedy, Jr. is the Secretary of HHS. The Secretary, as the federal official responsible for the administration of Medicare, has delegated that responsibility to CMS. 76 Fed. Reg. 13618 (Mar. 14, 2011).

## JURISDICTION AND VENUE

40.    This Court has jurisdiction under 42 U.S.C. § 1395oo(f) (appeal of final Medicare program agency decision) unless it is inapplicable, in which case this Court has jurisdiction under 5 U.S.C. § 704.

41.    Venue is proper under 42 U.S.C. § 1395oo(f)(1) (review of a final Board decision) and 28 U.S.C. § 1391(e) (action against an officer or employee of United States acting in his official capacity).

## FACTUAL BACKGROUND

**A.    General Background of the Medicare Program**

42.    Congress established the Medicare program to provide health insurance for the aged, disabled, and individuals with end-stage renal disease. 42 U.S.C. § 1395c.

43.    The Medicare program is federally funded and administered by the Secretary through CMS and its contractors. 42 U.S.C. § 1395kk; 42 Fed. Reg. 13,282 (Mar. 9, 1977). Congress granted HHS rulemaking authority to implement the Medicare program. 42 U.S.C. § 1395hh(a).

44.    The Medicare program is divided into several parts. Part A of the Medicare program provides for coverage and payment for, among others, inpatient hospital services. 42 U.S.C. §§ 1395c *et seq.* Part A services are furnished to Medicare beneficiaries by "providers" of services, including Bend, that have entered into written provider agreements with the Secretary to furnish hospital services to Medicare beneficiaries. *See* 42 U.S.C. §§ 1395c – 1395i-5.

45.    CMS pays providers participating in Part A of the Medicare program for covered services rendered to Medicare beneficiaries through Medicare Administrative Contractors (MACs), which are agents of the Secretary. Each Medicare-participating hospital is assigned to a MAC. 42 U.S.C. § 1395h.

46.    The amount of the Medicare Part A payment to a hospital for services furnished to Medicare beneficiaries is determined by its MAC based on instructions from CMS.

**B.    Medicare Inpatient Prospective Payment System**

47.    When Medicare was signed into law in 1965, participating hospitals were reimbursed retrospectively for their actual and reasonable costs incurred to provide care for Medicare

Complaint for Judicial Review                    14

beneficiaries. As Medicare costs grew, however, Congress considered different ways to manage them.

48.    Beginning with cost reporting years starting on or after October 1, 1983, Congress established the Inpatient Prospective Payment System (IPPS) to remove a hospital's incentive to provide more or unnecessary services to inpatients by replacing the payment-for-services-rendered model with a model that compensates subsection (d) acute care hospitals based on a regional average cost per patient, modified by (amongst other factors) the patient's illness or acuity in the form of a diagnosis-related group (DRG). 42 U.S.C. § 1395ww(d).

49.    In this way, subsection (d) acute care hospitals are reimbursed a prospectively-determined set amount that accommodates the average cost of care for a group of similar-acuity patients.

**C.    Sole Community Hospital Program**

50.    Under the acute care hospital inpatient prospective payment system (IPPS), special payment provisions are guaranteed to certain types of hospitals. One such type is the "Sole Community Hospital" (SCH).

51.    Even before transitioning from a fee-for-service model to IPPS, Congress recognized that SCHs had special needs requiring special reimbursement arrangements. Congress commanded the Secretary to provide SCHs with special exemptions, exceptions, and adjustments to the caps on payment imposed by TEFRA to compensate for:

> [T]he special needs of sole community hospitals … [such as] extraordinary circumstances beyond the hospital's control, medical and paramedical education costs, significantly fluctuating population in the service area of the hospital, and unusual labor costs.

42 U.S.C. § 1395ww(a)(2)(A), PL 97-248, Sep. 3, 1982, 96 Stat 324.

Complaint for Judicial Review                  15

52. Congress has subsequently refined the definition of SCH, the method of reimbursement for SCHs, and the additional payment assistance given to SCHs. But consistent across the past 44 years is Congress's recognition that, to provide exceptional healthcare services in isolated areas, it must reimburse those hospitals differently than other hospitals. Because, as Congress recognized when it passed TEFRA in 1982, averaging the operating cost per-patient and spreading hospital reimbursement across all of a hospital's patients without regard for the services rendered only works when the volume of patients is high enough. For hospitals with a low or "significantly fluctuating population in the service area of the hospital," an average cost-per-patient model will never fully reimburse the hospital for the costs of keeping full-time staff available to treat part-time patients.

53. The Secretary has recognized the SCH's need for a separate reimbursement scheme for just as long, acknowledging the necessity of supporting small rural hospitals for which "by reason of factors such as isolated location, weather conditions, travel conditions, or absence of other hospitals, is the sole source of inpatient hospital services reasonably available in a geographic area to Medicare beneficiaries." 42 C.F.R. § 405.476 (1983).

54. There are certain conditions that must be met to be classified as an SCH. One way for a hospital to be classified as a SCH is to be located more than 35 miles from another "like" hospital. 42 U.S.C. § 1395ww(d)(5)(D)(iii); see also 42 C.F.R. § 412.92(a) ("CMS classifies a hospital as a sole community hospital if it is located more than 35 miles from other like hospitals[.]") Bend met this definition as soon as Redmond retired its CCN and became Bend's remote location.

55. To trigger reimbursement as an SCH, a hospital that is more than 35 miles from other like hospitals must satisfy the minimal requirement imposed by regulation: the hospital must

Complaint for Judicial Review                16

make its request to the MAC. 42 C.F.R. § 412.92(b)(1)(i). Each other subparagraph of § 412.92(b)(1) applies to the other triggering provisions.

56. Then, the MAC reviews the request and sends the request, with its recommendation, to CMS; finally, CMS reviews the request and the MAC's recommendation and forwards its approval or disapproval to the MAC. *Id.* at (b)(1)(iv) and (v).

57. Once the SCH has made the request to the MAC, its SCH status "is effective as of the date the MAC receives the complete application[.]" *Id.* at (b)(2).

**D.     St. Charles Health System**

58. Prior to 2022, Plaintiff owned and operated four hospitals in Central Oregon:

   a.   St. Charles Bend (Medicare CCN 38-0047) in Bend, Oregon;

   b.   St. Charles Redmond (CCN 38-0040) in Redmond, Oregon;

   c.   St. Charles Madras (CCN 38-1324), a CAH in Madras, Oregon; and

   d.   St. Charles Prineville (CCN 38-1313), a CAH in Prineville, Oregon.

59. While each hospital had a separate CCN, Plaintiff enrolled them all in Medicare under its legal, not-for-profit corporate entity and EIN.

**E.     The Combination of Redmond into Bend**

60. Effective February 15, 2022 at 12:01 a.m., Redmond combined into Bend. It retired its CCN and became a remote location of Bend. This was not a change of ownership (CHOW), just a combination of two providers into one since each of these facilities were already unincorporated divisions of the same single legal entity.

61. Plaintiff made this decision strategically after significant study. Its options were either: (a) get Bend reimbursed as an SCH and continue providing care to a patient population that

Complaint for Judicial Review                    17

has no other care options for 111 miles; or (b) risk its providers closing like so many other rural hospitals and leave its community to fend for themselves.

62. Plaintiff's Board effectuated this combination through adoption of a Board Resolution and Plan of Merger. This was not a corporate merger or CHOW, as Medicare defines those actions; rather, Redmond's provider agreement merged into Bend's CCN, which constituted an administrative change. Plaintiff submitted these documents on behalf of Bend – perfunctorily – along with a related CMS Form 855A to notify CMS of the changed information. But because Plaintiff owned both CCNs, the provisions of 42 C.F.R. § 489.18 (Change of ownership) did not apply.

63. Provider agreements are automatically assigned to *new owners* (pursuant to 42 C.F.R. § 489.18(c)) when one of four *changes of ownership* have occurred (as defined at 42 C.F.R. § 489.18(a)). But Redmond's retirement of its CCN and combination with Bend under the same common owner was not:

    a. "[T]he removal, addition, or substitution of a partner;"

    b. "Transfer of title and property to another party;"

    c. "The merger of the provider corporation into another corporation, or the consolidation of two or more corporations resulting in the creation of a new corporation;" or

    d. "The lease of all or part of a provider facility."

64. Because Plaintiff already owned both provider agreements, there was *no new owner*. Thus, there was no "change of ownership as specified in paragraph (a) of this section" and there was no need for "the existing provider agreement [to be] automatically assigned to the new

owner." 42 C.F.R. § 489.18(c). Had Bend and Redmond been owned by two *different* legal entities, a CHOW must have predated the Medicare provider number combination.

65.    Rather, Plaintiff already commonly owned and operated Bend and Redmond (their provider numbers and provider agreements were housed within the same legal entity) and no corporate merger or CHOW occurred or was necessary. "If two facilities already have the same owner, the combination can occur because there is already common ownership. This is not a CHOW, just a combination of two providers into one." CMS's Program Memorandum 22-02-ALL, Dec. 23, 2021, Part I, § (III)(D).[4]

66.    With Redmond now a remote location of Bend, it no longer constituted a "like" hospital. Likewise, the only other two facilities within a 50-mile radius of Bend and the Redmond Campus were Madras and Prineville; and since both are critical access hospitals, they do not constitute "like" hospitals. 42 C.F.R. § 412.92(c)(2).

67.    Effective February 15, 2022, Bend met all statutory and regulatory requirements to be classified and reimbursed as an SCH. The next closest facility was McKenzie-Willamette Medical Center (CCN 38-0020) in Springfield, Oregon. It sits 111 road miles from the

---

[4] While the Board found that the above guidance was not in effect at the time the application was submitted, all of the relevant guidance that did exist at that time contained materially identical guidance. *See, e.g.*, Chapter 3, Section 3210.1D of the State Operations Manual, which has been effective since May 21, 2004, and provides the same guidance: ("[t]here would not be a CHOW as long as the same corporation continues to be the legal entity responsible for operation of the provider organization. A merger of one or more corporations with the Medicare-participating provider corporation surviving (i.e., a merger 'into' the participating corporation) is not recognized as a CHOW of the surviving corporation." *See also* 42 C.F.R. § 489.18 ("The merger of the provider corporation into another corporation, or the consolidation of two or more corporations, resulting in the creation of a new corporation constitutes change of ownership. Transfer of corporate stock or the merger of another corporation into the provider corporation does not constitute change of ownership.")

Complaint for Judicial Review                        19

Redmond Campus and 113 road miles from Bend's Main Campus. 42 U.S.C. § 1395ww(d)(5)(D)(iii) & 42 C.F.R. § 412.92(a).

**F.     Rural Reclassification**

68.     Having demonstrated it qualified as an SCH, Bend also qualified for rural reclassification. A hospital located in an urban area may be reclassified as a rural hospital if "[t]he hospital would qualify … as a sole community hospital under paragraph (5)(D) if the hospital were located in a rural area." 42 U.S.C. § 1395ww(d)(8)(E)(i)(III) & 42 C.F.R. § 412.103(a)(3).

69.     Bend's application for rural reclassification was complete, because it contained "an explanation of how the hospital meets the condition that constitutes the basis of the request for reclassification set forth in paragraph (a) of this section, including data and documentation necessary to support the request." 42 C.F.R. § 412.103(b)(2).

70.     The MAC agreed that Bend's application for SCH classification and rural reclassification was complete because it recommended approval effective as of February 15, 2022. Had it believed the application was incomplete, the MAC had an affirmative obligation to contact Bend to obtain additional information, and then, once all the necessary data had been obtained, to forward the complete package to CMS with its recommendation for further action. *See* Section 2810 of the Provider Reimbursement Manual Part 1. The MAC never contacted Bend for additional information or to advise that required documentation was incomplete or missing.

71.     As the MAC recognized, Plaintiff, on Bend's behalf, timely submitted the 855A Medicare enrollment updates via PECOS on March 9, 2022 in compliance with 42 C.F.R. § 424.516. Despite acknowledging that the 855 documentation was filed after the submission of the application and had not yet been approved by CMS, the MAC still recommended an

Complaint for Judicial Review                    20

effective date of as of February 15, 2022: "Once approved, the expected effective date will be 2/15/22."

## PROCEDURAL BACKGROUND

72. On October 11, 2022, Plaintiff filed a timely appeal with the Board challenging the April 15, 2022 denial of Rural Reclassification and added CMS's denial of Bend's application for SCH status to its appeal before the Board. The Board assigned that appeal Case # 23-0056.

73. The Board agreed that Plaintiff "met all jurisdictional requirements for a hearing before the Board." Exhibit 1.

74. On October 21, 2024, the parties requested a record hearing and submitted stipulations. The Board granted the parties' request on November 7, 2024.

75. On April 8, 2026, the Board issued its decision on this matter finding that "CMS properly denied the Provider's February 15, 2022 applications for SCH status and rural reclassification." Exhibit 1.

76. On May 26, 2026, the Administrator of CMS issued a letter declining to review the Board's adverse decision.

## BASES FOR APPEAL

77. Plaintiff repeats and realleges Paragraphs 1-76 as if set forth fully herein.

78. A hospital may obtain judicial review of a final administrative decision, whether substantive or jurisdictional, by filing suit within sixty days of receipt of the final action in the administrative appeal in the United States District Court for the judicial district in which the hospital is located or in the United States District Court for the District of Columbia. 42 U.S.C. § 1395oo(f). In any such action, the Secretary is the proper defendant because

Complaint for Judicial Review                21

the Secretary, acting through CMS, "is the real party of interest in any litigation involving the administration of the [Medicare] program." 42 C.F.R. § 421.5(b).

79. When Redmond combined into Bend and became a remote location which shared CCN 38-0047, Bend became more than 35 road miles from the next like hospital. As such, Congress commanded that it "shall be" reimbursed as an SCH. And as an SCH, Bend was entitled to be reclassified as rural.

80. CMS's analysis of Bend's application for SCH status and to be reclassified as rural should have been straightforward:

   a. Plaintiff retired Redmond's provider number (CCN 38-0040) and combined it with Bend's provider number (CCN 38-0047);

   b. Plaintiff made Redmond a remote location known as the Redmond Campus;

   c. Bend remained at least 35 miles from the next "like" hospital—making it an SCH effective when the MAC received Bend's complete application on February 15, 2022; and

   d. As an SCH, Bend could qualify as a rural hospital through the rural reclassification process.

81. Instead, CMS fabricated additional hoops for Plaintiff to jump through, apparently requiring Plaintiff to obtain CMS's approval of the combination and submit that approval back to CMS.

82. These additional requirements were ratified or approved by the Board on appeal, when it denied Bend relief.

## I.    CMS violated the Medicare Act.

83.    CMS violated the Medicare Act by imposing additional requirements not found in the governing statute or regulations. Congress did not impose these requirements, and CMS exceeded the authority delegated to it by Congress. CMS violated 42 U.S.C. §§ 1395ww(d)(5)(D)(iii) and (d)(8)(E) by refusing to reimburse Bend pursuant to their statutory terms.

84.    The Medicare Statute provides that "[n]o rule, requirement, or other statement of policy … that establishes or changes a substantive legal standard governing … the payment for services, … shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1)." 42 U.S.C. § 1395hh(a)(2).

85.    The Statute further provides that "before issuing in final form any regulation under subsection (a), the Secretary shall provide for notice of the proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon." § 1395hh(b)(1).

86.    CMS's requirement that Redmond's combination into Bend be approved by CMS and submitted to CMS as part of the Application for SCH status changed a substantive legal standard governing payment and cannot take effect absent notice-and-comment rulemaking. *Azar v. Allina Health Services*, 587 U.S. 566 (2019).

87.    By reading in this requirement to obtain CMS's approval of the combination of Redmond into Bend and then submit that approval back to CMS, CMS deviated from Congress's statutory commands and exceeded its interpretive authority. In substituting statutory and regulatory requirements with such an impermissible interpretation, CMS ignored the best

Complaint for Judicial Review                23

reading of the statute and violated federal law. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

88.    If it prevails in its appeal, the Court shall award Plaintiff interest. 42 U.S.C. § 1395oo(f)(2).

**II.    CMS violated the Administrative Procedure Act.**

89.    CMS violated the Administrative Procedure Act because both its action and the Board's denial of Plaintiff's appeal were capricious, an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (C).

**REQUESTS FOR RELIEF**

Therefore, Plaintiff requests this Court:

1.    Vacate, reverse, or set aside the Board's Opinion denying Plaintiff's appeal and affirming CMS's denial of Bend's February 15, 2022 Application;

2.    Issue an Order requiring the Board, CMS, or the Secretary to approve Bend's February 15, 2022 Application;

3.    Issue an Order directing the Secretary to reimburse Bend, as a Sole Community Hospital that had been reclassified as rural, for its treatment of Medicare beneficiaries during the period between February 15, 2022 and May 12, 2022;

4.    Issue an Order that the Court shall retain jurisdiction over this action for purposes of enforcement unless or until receipt of Plaintiff's notice of the Board's, CMS's, or the Secretary's compliance with this Court's Orders;

5.    Award Plaintiff its costs incurred in prosecuting this appeal;

6.    Award interest as required by 42 U.S.C. § 1395oo(f)(2); and

7.    Award all other relief this Court may consider appropriate, just, and proper.

Complaint for Judicial Review                    24

Respectfully submitted this 5th day of June, 2026.

ST. CHARLES HEALTH SYSTEM, INC.

By:    *s/ Josephine H. Mooney*
Josephine H. Mooney, OSB #882738
Attorneys for Plaintiff (*Local Counsel*)

HALL, RENDER, KILLIAN, HEATH & LYMAN, P.C.

By:    *s/ Ryan A. McDonald*
Ryan A. McDonald, IN Attorney Reg. #36118-30
Attorneys for Plaintiff (*Pro Hac Vice*)

HALL, RENDER, KILLIAN, HEATH & LYMAN, P.C.

By:    *s/ Lindsay K. McManus*
Lindsay K. McManus, CO Attorney Reg. #56572
Attorneys for Plaintiff (*Pro Hac Vice*)